# CIRCUIT COURT OF BALTIMORE CITY.

Filed June 2, 1914.

THE UNITED RAILWAYS AND ELECTRIC COMPANY OF BALTIMORE
VS.
PHILIP D. LAIRD, ET AL.

*J. Pembroke Thom* and *Joseph C. France* for plaintiff.

*W. Cabell Bruce* and *Osborne I. Yellott* for defendants.

DUFFY, J.—

The territory in Baltimore and Harford counties northeast of the city is rural. It is served by the Maryland and Pennsylvania Railroad on the northwest and by the Baltimore and Ohio and the Pennsylvania Railroads on the southeast. Between the Maryland and Pennsylvania and the Baltimore and Ohio the distance is about six miles. Between these two railroads run the Philadelphia road with no tracks upon it, the Belair road, upon which the complainant's tracks run to Overlea, a distance of 4.35 miles from North avenue, and the Harford road, on which complainant's tracks run to Hamilton, a distance of 3.47 miles from North avenue. On the Harford road from Hamilton to Carney, a distance of 3.22 miles, run the tracks of the Baltimore and Belair Railway. The service on the latter railway is half-hourly with a single track. On the Belair and Harford roads to the points above named the complainant has double tracks and furnishes adequate service (about four minutes). The Maryland and Pennsylvania furnishes at least six trains each way week days and five trains each way on Sundays. The Baltimore and Ohio furnishes five trains each way on week days and on Sundays five trains running out of Baltimore and three trains running into Baltimore. These two railroads must take care of much of the traffic of this territory.

The Harford road and the Belair road, for the purposes of this case, may be said to be parallel, and they are about a mile and a half apart. The line from North avenue to Hamilton on the Harford road and the line from North avenue to Overlea on the Belair road would be competing lines if they were owned and operated by different companies. If the extension ordered in this case is built it will be in com-

petition, as to the first fare zone, with the Baltimore and Belair Railway between Hamilton and Carney. The Baltimore and Belair Railway was promoted by Mr. Shriver, a witness in this case. It was chartered in 1904 to be constructed from Hamilton to Belair. It has $46,000 of stock subscribed and paid for by residents of Baltimore and Harford counties. Mr. Shriver testified that he had on hand a project to continue his electric railroad from Carney to Belair on private right of way, and that there is room in this territory for one electric road, but not enough for two. It will thus be seen that the territory between Overlea and the Gunpowder River has some service, with a prospect of an extension from Carney to Belair. If this proposed extension becomes an accomplished fact this territory will have all the service it can support. The claim, therefore, of Mr. Garrett Brown and the other petitioners before the commission is not as meritorious as it would be if they were without any service at all.

Much has been said in the argument about profession of service by the company as to this territory. Of course, where the company has contracted or professed to serve, this will be an important consideration with the commission in determining whether or not the company shall be ordered to fulfill its contract or profession, but it will not be contended that for this reason the commission is bound to exercise such authority in a case where to increase the operations of the company will impair its efficiency in the field in which it has theretofore operated—for the company may have contracted or professed too much. Nor will a profession of service make an order of the commission reasonable which is otherwise not so. The Whalen case, in 108 Md. 23, is in point here. The company changed its line and abandoned a siding which it was bound to maintain by contract which enured to the benefit of the complainant Whalen. For this breach he could recover damages, but the court refused to intervene by injunction in behalf of the complainant, holding that to do so would impose upon the company an unreasonable burden wholly out of proportion to any benefit that would accrue to the complainant, the company having straightened its line and reduced its grades for the purpose of improving

its service. If this question had been submitted to the commission instead of the Court of Equity, its decision would no doubt have been the same. A company will be allowed to refuse to furnish service or will be allowed to abandon service previously rendered where it appears that the public interest does not require the service to be furnished or continued. 197 Mass. 560, Weld vs. Commissioners; 12 Gray 180, Comm. vs. Fitchburg Co.; 103 N. Y. 951, People vs. Rome, &c., Co.

The commission calculated on single track, four inches of ballast and cars the size of those used on the Baltimore and Belair road. This grade of construction and equipment is not uncommon on suburban roads. On all suburban branches of the company six inches of ballast is used and larger and better cars than those used on the Baltimore and Belair road. If the company is compelled to build this extension they wish to give the same double-tracked roadbed and service and equipment as it now gives to its Towson, Emory Grove and Catonsville, Sparrows Point and Ellicott City Branches. The company no doubt feels that if compelled at all, it will probably get more revenue out of first-class service than out of second-class service, and with much less danger and consequent damage suits. Furthermore, Mr. Cross testified that he thought the public would not be satisfied with a lower grade equipment and service. This question of danger of accidents appears to me to be of more importance than would appear from the testimony—the witnesses say but little about it. A public service corporation which bears to the community the relation that the company does to Baltimore should be not only encouraged, but held up to a high grade of efficiency of service. If now, in order to prevent the cost of this new extension from being so heavy as to be unreasonably high in proportion to its revenue-producing power, the quality and efficiency must be lowered below that of the suburban branches above named, this seems to me to be an important consideration in determining whether or not this extension should be compelled.

The authority to determine on the quality and grade of equipment is peculiarly the province of the board of directors of the company, because of the responsibility of the board to the stockholders for the proper management of the road and its finances, and because of the responsibility of the company for negligent construction or management; for it must be borne in mind that the order of the commission will not absolve the company from the charge of negligence where the default is judicially imputed to the act of the company, although done in compliance with the commission's order. The Public Service Commission Act does confer important duties on the commission with regard to compelling efficiency where this is found to be unsafe or inadequate (Section 23). But when a new improvement is ordered into untried territory, it is as much the province of the company to determine on the quality of construction as it is to determine on the plan of financing it, subject to the provisions of the above-named sections, for the quality of construction, the probable revenue-producing power and the ability to finance the construction are interdependent.

In Laird vs. B. & O. R. R., 121 Md. 187, the Court of Appeals has said: "The discretion of a public service commission can not override the discretion of the officers of the corporation in the management of its affairs or the provisions of the statute in which securities are permitted to be issued."

Commissioner Laird, on page 29 of his opinion, uses this language:

"From a careful study of the situation we do not think the most expensive construction is necessary to provide safe and adequate service to the territory to be served by this extension. It should not be flimsy or of a kind that will be expensive in the upkeep, but it need not be of the kind that the traffic of a busy city requires. A single-track road would be ample for some years to come to take care of the situation. It is probable that real economy would result from the use of rock ballast instead of earth, and from the evidence before us we incline to the opinion that the engineer's second estimate of $189,832 is ample to cover the cost of the necessary installation to serve the territory for some time to come."

The "second estimate" alluded to is that of Mr. Phelps for single track and 4 inches of rock ballast. On all of its

other suburban lines the Company uses 6 inches of rock ballast. This looks like a mere detail, and yet it leads right up to risk of accident and the attendant liability of the Company, as well as to the durability of the work, and the cost of upkeep, questions I think peculiarly within the province of the Board of Directors and the officers of the Company. The order of the Commission calls for 4 inches of rock ballast, but of course the order means to leave the use of a greater amount of ballast to the discretion of the Company. This difference of 2 inches of rock ballast may not be of much practical importance, I cite it to concretely illustrate that in order to accomplish this public improvement the Commission is satisfied with the construction of a lower quality than that dictated by the discretion of the board of directors of the Company in constructing its other suburban lines, and to re-enforce the proposition that if this territory can not support an improvement of the same quality as other territories in which the suburban lines of the complainant now operate, this is an important argument against the public need for this improvement.

The evidence of the proposed cost and the prospective revenue to be derived from the operation of this extension is speculative. The Commission had before it no substantial facts, demonstrated by experience to be accurate, upon which to base its findings. I am well aware that this may be said of many cases before the Commission, and that consequently the work of the Commission should not be hampered by laying too much stress on this defect in proof which, owing to the nature of the business, the Commission is unable to supply. In appeals from the action of the Commission, Courts must take this into consideration, and make due allowance for it. But I think that in case of an extension into new territory, before the advance should be ordered it should be made to appear that there is a fair prospect that the new territory to be served will be able to furnish sufficient business to yield a fair return. I think the testimony before the Court leaves it very much in doubt whether any profit at all will be returned for several years. The Court of Appeals were considering this question of a fair return for the service in the switching

case, when they used this language: "We do not think that they can be required to perform such service except upon payment of a reasonable charge for the service of carriage and use of the terminals. We cannot adopt the view that common carriers may be required to perform services at rates less than the actual cost of such services for that would amount to confiscation, and would ultimately defeat the very ends they are designed to accomplish, namely, to subserve the public good and public convenience."

Whether or not Martenet, or his assigns, are under obligation to build the proposed extension by contract or by profession of service, or because the company is using a part of the franchise on the Belair Road, and is failing to use the balance of it, is of little moment. The authority of the Commission is not governed by these considerations. The Commission's authority to order this extension in a proper case is ample as I construe the Public Service Commission Act. The Company's primary obligation is to serve the City of Baltimore and those suburban districts which it now serves; if it owes any obligation at all to a new neighborhood like the one in question, this obligation is secondary.

If the Commission's order is put into operation, what will happen is this: The Company will raise the necessary amount of capital, the extension will be built, and it will be divided into two fare zones, with a single fare of five cents each. The Company will not be permitted to fix the fare at such a rate or increase the number of zones so as to yield a reasonable return on the money invested. The company must not only lay out the money for the new venture, but stand the inadequate returns, if the Commissioners' estimate of the return should prove to be erroneous.

This is in substance the regulation of a rate; if it is, then I think it is so unreasonable as to infringe upon the due process of law clause of the 14th Amendment.

If it is not the regulation of a rate, what then? It must be construed as requiring an additional facility on the part of the Company. Now, while it is competent for the Commission to compel the Company to add a facility although the new facility may add nothing to the Company's revenue;

still it has been held in the Atlantic Coast Line case, 206 U. S. 22, that the nature and extent of the existing facilities furnished by the Company are essential to be considered in determining whether or not an order to increase facilities is just and reasonable; and that a deficiency of facilities must clearly appear to justify an order directing new and additional facilities.

Mr. Cross testified that for five or six years past the Company has been under very heavy expenses in meeting the requirements of public bodies, such as the Paving Commission, the State's Road Commission and the Sewerage Commission. The Company is bound by its charter, or some other provision of law, to keep in repair the paving within its tracks and two feet outside of its tracks. He also testified that the Company is required to extend its underground feeder, which is costing from $100,000 to $150,000 annually. For these outlays the Company does not receive any increased revenue. Its taxes amount to nearly 9½% of its gross receipts. The City of Baltimore has a right to expect these large outlays to be made, and will no doubt hereafter increase them. Attention is called to the case of United Railways Co. vs. Mayor and City Council of Baltimore, 121 Md. 552, which discloses that an effort was made by the City to compel this Company to stand the expense of installing a large amount of improved pavement on the City Streets. It failed for technical reasons. Similar efforts will no doubt be properly made, and when based on appropriate legislation may be supported. The ability of the Company to meet these important demands of the City should not be impaired by compelling the Company to make a large outlay and possibly to operate the new addition for several years without profit, under the guise of adding a mere facility to its present operations and its liabilities above mentioned.

In the case of 12 Gray, 189, above cited, the Court was applying this principle on a state of facts analogous to those in this proceeding, and uses this language:

"It is to be considered that the respondent corporation has under its charter other roads to maintain, and other duties to the public to discharge, and the running of passenger trains on these branches might exhaust its re-

sources and render it incapable of discharging these other duties. It would seem to be, therefore, not only its right but its duty to exercise a sound discretion in the use of its capital, lest by exhausting it, upon trains that were not required by the public wants, it should deprive itself of the means of running at reasonable rates those that were."

That the Commissioners' orders in the premises may be reasonable, it must appear that the new service is needed by the community served by the Company as a whole: It is not enough for Mr. Garrett Brown and his neighbors to show that they badly need additional service. In considering this question as applied to extension of gas mains, Wyman says:

"But a great deal of business must be shown in order to establish certainly the present obligation to construct new lines in outlying territory. The undertaking to serve a community does not, therefore, lay the company open to outrageous demands in individual cases, but to such service as the community considered as a whole may demand." Wyman, Secs. 281, 282.

I therefore conclude that the order of the Commission passed in this proceeding is unreasonable within the meaning of Section 44 of the Commission Act, and that the injunction should be ordered.